SWEDA, Plaintiff in error, vs. THE STATE, Defendant in error.

*November 13, 1931—January 12, 1932.*

For the plaintiff in error there was a brief by *Lawrence H. Smith*, attorney, and *Carroll R. Heft* of counsel, both of Racine, and oral argument by *Mr. Smith*.

For the defendant in error there was a brief by *Earl F. Buelow*, special assistant to the district attorney of Racine county, *Charles F. Prudent*, district attorney, the *Attorney General*, and *J. E. Messerschmidt*, assistant attorney general, and oral argument by *Mr. Buelow* and *Mr. Messerschmidt*.

FRITZ, J. On a trial, at which Bronislaw Sweda was vigorously defended by counsel and his rights properly safeguarded by the trial judge, a jury nevertheless found him guilty of murder in the first degree for killing Julius Segalbach on January 9, 1930. Three stenographically recorded confessions made voluntarily by Sweda on occasions separated by substantial intervals during a period of ten hours, together with the testimony of Rose Segalbach, the

widow of the homicide victim, and numerous corroborating circumstances testified to by credible witnesses, convincingly established Sweda's guilt beyond any reasonable doubt. The jury's verdict was well warranted by the evidence, and the conviction must be sustained unless error, affecting substantial rights of the defendant, occurred on the part of the trial judge in some respect hereinafter considered. No useful purpose would be served by detailing the facts and circumstances of the homicide.

Error is assigned because the court admitted in evidence proof establishing three confessions by the defendant, in which he stated that he shot Julius Segalbach under circumstances which constituted murder in the first degree. Sweda's counsel contends that the confessions were not made voluntarily, but were wrung from Sweda by brutal and inhuman treatment by the police, after he had been in custody about twelve hours. Sweda was arrested, while standing in the doorway of the store where the homicide occurred, upon the arrival of the police shortly after the shooting. He was taken to the police station about noon and kept there in custody that afternoon and night, excepting for some time during the late afternoon, when the police officers went with him to the store. There is evidence that, within an hour after Sweda arrived at the police station, two assistants of the district attorney questioned him for about three-quarters of an hour, but only after fully advising him as to his constitutional rights to refuse to answer. Sweda then denied shooting Segalbach. Thereafter Sweda was questioned from time to time by various officials, and one of them testified that at 7 p. m. Sweda said, "I came into the store. Julius had a gun. We wrestled, and while we were fighting the gun went off;" and that at 8:30 p. m. Sweda said, "I came into the store. Julius had a gun. I grabbed the gun away from Julius and I shot him." The first of the three confessions in which Sweda admitted the shooting, under

circumstances constituting murder in the first degree, was made about midnight at the police station in the presence of the district attorney, who again advised Sweda of his constitutional right to refuse to speak, and also that his voluntary statements could be used against him. That confession was repeated the next morning at the office of the district attorney, and again thereafter at a preliminary examination before a court commissioner, who thoroughly explained to Sweda his constitutional rights and privileges.

However, on the trial Sweda testified that at the police station he was subjected to continued mental and physical abuse, maltreatment, and deprivations by police officials, which, if his testimony were true, would certainly have constituted brutal and inhuman treatment that was wholly inexcusable and decidedly reprehensible. It is claimed that his testimony is corroborated by discolorations on his left arm, his back, and behind an ear, which two physicians testified that they found, and considered due to physical force. Their examinations were not made until some hours after Sweda had been transferred to the county jail, after a reopened preliminary hearing at which he was represented by counsel, and during the course of which there was no indication of any physical injury. The trial judge, fully aware that, before a confession should be admitted in evidence, it must be established by the State that it was made voluntarily and without any fear by the accused, and was obtained without any sort of threat or violence or promise, direct or implied, to the accused, received all evidence properly admissible on those matters. Sweda's testimony as to mistreatment was unequivocally contradicted by testimony of the police, prosecuting officials, and stenographers, who came into contact with him until he finally made the first of the three confessions, upon which the prosecution relies; and their testimony is corroborated by a fellow prisoner at the jail, and also by a casual visitor, who was inspecting

the station, and to whom Sweda first indicated his desire to state the facts which constitute the first of those three confessions. Furthermore, the court commissioner, stenographer, and a newspaper reporter, who heard Sweda's confession to the same effect at the first hearing on his preliminary examination, testified that he did not appear to be scared and seemed rather self-controlled. On that occasion the very first questions put, and Sweda's answers, were as follows:

"*Q*. Now, Bruno, before you do any talking, as I explained to you before, do you understand that you don't have to talk unless you want to? *A*. What? *Q*. You don't have to talk unless you want to. *A*. I want to talk.

"*Q*. You understand anything you say here now can be used when you go before the judge? You understand that? *A*. Yes. *Q*. Before Judge BELDEN of the circuit court? Anything you tell us here now can be used against you. I want you to understand that we are not making any promises to you to make you talk, nor any inducements to you, and we don't want you to feel there is any threat being made to make you talk. We don't want to scare you, but want you to talk of your own free will. Do you understand that? *A*. Yes. *Q*. Do you want to tell us what happened up there? *A*. Yes."

Notwithstanding the conflict and contradictions in the evidence, it was, under all of the evidence, the duty of the trial judge to determine in the first instance, as he did, whether the State had established that the confessions were made voluntarily and were obtained under such circumstances that they were admissible. *Hintz v. State,* 125 Wis. 405, 104 N. W. 110; *Tarasinski v. State,* 146 Wis. 508, 131 N. W. 889.

His determination that the confessions were admissible was well warranted by the evidence. In so ruling he well appreciated that the final determination of the issues of fact, upon which the voluntary character and admissibility of the confessions depended, had to be left with the jury, and that

it was within the latter's province to reject any confession if the State failed to establish that it was voluntary and not obtained by improper means. Those issues were duly submitted to the jury by instructions which properly and fully covered the subject, as follows:

"If you believe that any confession in evidence was obtained by abuse, force, threats, coercion, or while, according to the evidence, the defendant was under the influence of fear of physical punishment by those having him in custody, then you should wholly reject any confession so made. The burden of proof that confessions were voluntary and not obtained by improper means rests upon the State. You are instructed that if you are satisfied that the original or first confession was made in consequence of abuse, fear, threats, or coercion, or while the defendant was under the influence of fear, then it is a presumption of law that such improper influence continued and operated upon subsequent confessions unless it affirmatively appears that such coercive influence or fear had ceased to operate upon and influence the defendant in making his subsequent confessions. If you are satisfied that the original or first confession was improperly obtained or made under the influence of coercion or fear, then the burden is upon the State to satisfy you that such improper influence or fear had ceased to operate upon the mind of the defendant before he made subsequent confessions.

"You are instructed that a confession is a voluntary statement made at any time by a person admitting that he has committed the crime in question. In order to entitle it to be considered by the jury, such confession must be the free and voluntary act of the defendant. This means that the confession must not have been obtained by any sort of threat or coercion or by any sort of violence practiced upon the accused.

"You are at liberty to accept or reject the whole or any part of any or all of the confessions in evidence accordingly as you are satisfied by the evidence that they or any part of them were obtained or made under proper or improper influences or conditions and accordingly as you are satisfied by all the evidence in the case the same were voluntary or in-

voluntary. In considering whether the confessions, or any of them or any part of them, are voluntary or involuntary, you may consider the age, disposition, education, experience, character, intelligence, previous training, and susceptibility of the accused to threats, violence or coercion, if any was used, as shown by all the evidence bearing upon that subject."

On this appeal counsel objects to the second last sentence of the instruction quoted. However, we find no error therein, and that sentence must, of course, be considered in connection with the entire instructions on that subject. The instructions, as an entirety, are well within the rules laid down in the opinions and cases cited in *Lang v. State,* 178 Wis. 114, 189 N. W. 558, and *Jones v. State,* 184 Wis. 50, 198 N. W. 598.

Error is assigned because of the admission in evidence of a package of cartridges, which police officers testified were found by them upon their search of Sweda's trunk, which was in the private room which he had occupied. It is contended that the evidence was secured by unlawful search and seizure in violation of the constitutional guaranty. The search was made during Sweda's absence and while he was in custody at the station. There is evidence, which the court and jury could consider credible, that during the questioning of Sweda at the station he told Detective McEachern that he had no more guns, and McEachern could look in his trunk if he wanted to; that McEachern said, "I suppose you have some more cartridges in your trunk;" that Sweda said, "I don't know anything about it. You can go up and look in the trunk and see;" that in the meantime Detective Yanney called up and asked McEachern to get permission from Sweda to search the trunk, which the officers did; that then officer Neitzel asked Sweda, "Which is the key to the trunk," and Sweda pointed out the key; and that Sweda said, "You can look in my trunk and see." That evidence,

although contradicted by Sweda, warranted the court and jury in finding that he consented to the search of his trunk, and thereby waived his constitutional right to be secure against unlawful search. *Reiser v. State,* 190 Wis. 248, 208 N. W. 797.

Error is assigned because of the omission of the court to submit to the jury the lesser degrees of homicide as requested on behalf of the defendant. On his behalf it is contended that, although defendant on the trial unequivocally testified that he was not present at all when the shooting occurred, and absolutely repudiated all of his confessions, the jury might nevertheless have found him guilty of a crime necessarily involving heat of passion or some degree of homicide less than murder in the first degree; and that he was therefore entitled to have such lesser degrees submitted to the jury, under the rule in *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14. In that case it was held reversible error to submit only murder in the first degree, when circumstances established by evidence admitted also of lesser degrees of manslaughter, because they warranted finding that the accused committed the act in the heat of passion. In that case the accused had testified that he was not angry, during the course of the occurrences which resulted in the death of his wife, but which occurred in his presence and in which he admitted participating. However, the evidence warranted finding that he was in a high state of anger and under the influence of liquor at the time.

In *Duthey v. State,* 131 Wis. 178, 111 N. W. 222, it was also held reversible error not to submit the third or fourth degrees of manslaughter. In that case the accused did not testify that he was not present at the killing. His own testimony asserted rather delirium and unconsciousness of his acts at the time. There was other evidence which might have been construed by the jury as indicating a confused or even

unconscious condition of mind, or the blindness of rage and passion. This court said: "If the evidence, *in any reasonable view,* could support either of these lower degrees, this refusal was error, from which prejudice to the defendant is undeniable."

On the other hand, in *Weisenbach v. State,* 138 Wis. 152, 119 N. W. 843, the plaintiff in error was convicted of assault with intent to murder, and error was predicated on the refusal of the court to submit to the jury the question of whether, if the accused was guilty at all, it was of any higher offense than assault and battery. The accused testified that he was not present at the scene of the shooting. It was said by this court that to justify a conviction, and submittal for conviction of a lesser offense included within the greater, "there must be some *reasonable ground* on the evidence, in the judgment of the court, for a conviction of the former and not of the latter." In the final analysis of the evidence, the test to be applied, in determining whether lesser degrees of the offense charged are to be submitted on request, is whether in any reasonable view of the evidence there is reasonable ground on the evidence, in the judgment of the court, for a conviction of the lesser offense and not the greater. See *Hempton v. State,* 111 Wis. 127, 140, 86 N. W. 596; *Weisenbach v. State, supra; Krueger v. State,* 171 Wis. 566, 578, 177 N. W. 917; *Meyer v. State,* 176 Wis. 184, 187, 185 N. W. 520. Of course, if there was no request, on behalf of defendant, for the submittal of lesser degrees of the offense, then the court's omission in that respect does not constitute error of which defendant can complain. Frequently, as stated in *Fertig v. State,* 100 Wis. 301, 310, 75 N. W. 960, the instruction given to the effect that defendant was guilty of murder in the first degree, or not guilty, is favorable rather than prejudicial to the accused, if there was any evidence on which he

might have been convicted of the lesser offense. Having had the advantage of that favorable situation, and acquiesced therein by omitting to request the submittal to the jury of lesser degrees, defendant cannot subsequently, upon conviction, predicate reversible error because of an omission which before the return of a verdict appeared to be to his advantage.

In the case at bar, Sweda testified on the trial, positively and unequivocally, that he was not present when the shooting occurred. If that testimony was true and believed by the jury, then Sweda was entitled to an acquittal, and there was no basis under that testimony for any finding as to any lesser offense. On the other hand, that testimony is irreconcilably contradicted by the testimony of the only eyewitness, Rose Segalbach, and by Sweda's statements in his three last confessions, that after Sweda had been alone for about fifteen minutes in another room in the building, he entered at the rear door of the store, while Julius Segalbach was looking out of the front window, unaware of Sweda's presence; that Sweda, with a revolver in his pocket, walked up in back of Julius and, without saying or doing anything to indicate his presence, held the revolver close to Julius' head and fired the fatal shot. Clearly, there is no occasion under that evidence for the submittal of any lesser degree. The only evidence in the case which could possibly be considered to afford any basis for convicting of an offense of some lesser degree is the testimony that Sweda, after having denied for six hours that he was present at all when Julius was shot, stated at first, "I came into the store. Julius had a gun. We wrestled, and while we were fighting the gun went off;" and stated an hour later, "I came into the store. Julius had a gun. I grabbed the gun away from Julius and I shot him." Manifestly, those self-serving and somewhat conflicting statements, the truth of which was entirely denied

by his own testimony on the trial that the shooting occurred in his absence, do not in any reasonable view afford any reasonable ground on the evidence, in the judgment of a court, for assuming that a jury would rightly convict of any lesser offense than murder in the first degree. As it seems wholly improbable, under the evidence in this case, that the omission to submit the lesser degrees has affected any substantial right, the court's refusal so to do was not prejudicial error and hence affords no basis for reversal. Sec. 274.37, Stats.; *Dickerson v. State,* 48 Wis. 288, 4 N. W. 321; *Fertig v. State,* 100 Wis. 301, 75 N. W. 960; *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546; *Patzer v. State,* 158 Wis. 39, 147 N.. W. 1022; *Schmidt v. State,* 159 Wis. 15, 149 N. W. 388.

Error is also assigned because of the refusal to grant a new trial on the ground of newly-discovered evidence. The new evidence related to two statements charged in an affidavit by Anna Zurawski, a former friend of Rose Segalbach, to have been made, respectively, before the killing of Julius Segalbach, and after the conviction of Sweda. The statements, if made, would have constituted admissions tending to establish that Rose Segalbach procured some stranger to kill her husband. In a counter-affidavit Rose Segalbach denied ever making the statements, and stated facts as to quarrels between herself and Anna Zurawski because of which it was charged that the latter's affidavit was motivated by animosity toward Rose Segalbach. Under the circumstances there is occasion for considerable doubt as to the credibility of the newly-discovered evidence. At best it would merely tend to impeach the credibility of the witness Rose Segalbach, and thus hardly affords sufficient basis for disturbing the verdict. *State v. Leppere,* 66 Wis. 355, 28 N. W. 376; *State v. Rickaby,* 198 Wis. 551, 224 N. W. 477; 33 A. L. R. 550; 16 Corp. Jur. p. 1204. At all events, the

question whether or not a new trial should be granted upon the ground of newly-discovered evidence rests very largely in the discretion of the trial court, and the trial court's decision on the matter will not be disturbed in the absence of a clear abuse of that discretion. *Hedger v. State,* 144 Wis. 279, 128 N. W. 80; *Fenelon v. State,* 198 Wis. 247, 223 N. W. 833. There is no basis for concluding that there was any such abuse of discretion in the case at bar.

*By the Court.*—Judgment affirmed.